UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                                              CR# 03-10362 PBS

SEAN D. STARK

### DEFENDANT SEAN D. STARK'S MEMORANDUM OF FACT AND LAW IN SUPPORT OF HIS MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO A MOTOR VEHICLE STOP

Now comes the defendant in the above action, Sean D. Stark, and submits this Memorandum of Law and Fact in support of his Motion to Suppress all evidence discovered and seized during a motor vehicle stop on October 22, 2003.

### STATEMENT OF FACTS

On October 22, 2003, the defendant, Sean Stark, was riding in a "Recreational Vehicle" (RV) traveling eastbound on Interstate 44 in Missouri. The RV was driven by Christopher Sugar, and there were only the two people in the RV. Mr. Stark had written permission from the owner of the RV to drive and use it for a long distance trip, and Mr. Stark had control of the RV and its contents. As they were traveling down a wide divided highway, the vehicle was stopped for a "moving violation." Mr. Stark did not witness any traffic violations committed by Mr. Sugar, and does not believe that any were committed.

The RV was pulled over by a Deputy Carmelo Crivello, driving a marked police car. Deputy Crivello approached the RV and began asking the two men questions, including where they were going. After taking Mr. Sugar's driver's license, the officer returned to his vehicle to "run the license." The

officer remained in his car for more than a minute.

After that delay, the Deputy returned to the motor home, and told Mr. Sugar and Mr. Stark that he stopped the vehicle because he thought the driver had been drinking, but did not perform any field sobriety tests. Deputy Crivello also stated that "what I'm looking for is narcotics," and asked if he could search the RV.

The defendant, Mr. Stark, had written permission to use the RV, and denied the officer permission to search the RV. At that time, the officer took the driver, Mr. Sugar, back to his patrol car for more than 5 minutes to question him. At no time were the two men free to leave during this stop.

After another five minutes or so had passed, Mr. Stark walked back to the patrol car to ask how much longer they would be detained. The officer informed him that they would be held there until a canine unit arrived.[1] A period of time passed before the canine unit arrived, and while the Mr. Stark and Mr. Sugar were waiting, the officer told Mr. Stark that if they had "personal use" marijuana in the vehicle, he would allow the men to "dump it in the median and leave." All of this occurred after the denial of consent to search.

Several minutes after that, the canine unit arrived, and was accompanied by several plainclothes officers. The "trainer" walked the dog around the vehicle more than four times. The dog repeatedly pulled the trainer down the hill, and was not focusing on the motor home. At one point during the

---

[1] The Deputy's account and Mr. Stark's account differ slightly on when the Deputy informed the parties that a canine "sniff" was forthcoming. The deputy states in his report that it was immediately after the parties denied him permission to search, but before he had written a summons. Mr. Stark recalls the statement about the canine sniff coming when he walked back to the cruiser, but likewise before a summons had been completed.

walking around, the dog became aroused. At no point during this encounter did officers get a warrant to search the RV. On approximately the fourth trip around the motor home, the dog barked at the front door to the motor home. The dog had been wandering around near the motor home for about 2 minutes. After the dog barked at the door, the officers entered the vehicle without seeking consent from either passenger. After they had been in the vehicle a short time, they came out to ask Mr. Stark to unlock a closet. Mr. Stark did not have a key, so officers forced the closet door open, despite the fact that the dog never went into the motor home.

Allegedly as a result of the search of that closet, officers recovered a firearm and a large quantity of marijuana, for which the defendant has been indicted. After the conclusion of the search, one of the officers who was with the canine unit informed Mr. Stark that the officer who pulled over the RV was paid to pull over vehicles searching for narcotics.

## ARGUMENT

1.  <u>The defendant Sean Stark has standing to challenge the seizure of the RV.</u>

Sean Stark had a legitimate expectation of privacy in the RV, because he was present in the vehicle, had explicit written permission to use the RV, and was therefore responsible for the contents of the RV and the use thereof. See e.g. U.S. v. Baker, 221 F.3d 438, 442 (3rd Cir. 2000) (legitimate expectation of privacy in borrowed car because defendant had substantial control, had the keys to it, and the car was not stolen property); U.S. v. Orrego-Fernandez, 78 F.3d 1497, 1502 (10th Cir. 1996) (legitimate expectation of privacy in car because defendant stated he had owners's permission to drive car and produced insurance card).

The analysis of standing involves "a legitimate expectation of privacy in the premises he was using and therefore [he] could claim the protection of the Fourth Amendment with respect to a governmental invasion of those premises, even though his "interest" in those premises might not have been a recognized property interest at common law. See Rakas v. Illinois, 439 U.S. 128, 143 (1978), citing Jones v. United States, 362 U.S. 257, 261 (1960). Whereas a mere passenger in a vehicle may not have any legitimate expectation of privacy in that vehicle, in this case it was Stark who had explicit (written) permission to use the RV, and had a long term interest in the vehicle. Cf. id. There is no question that under the circumstances of this case, not only did Stark have a legitimate expectation of privacy in the RV, but he had legitimate authority to use it, and was the person in control of the RV, because of the letter of permission, at the time of the stop.

2. There was no reasonable suspicion to believe that the defendants were committing a crime at the time the officer stopped and seized the RV.

It is beyond refute that a police officer, in the discharge of his duties, may reasonably detain a person whom he has a reasonable suspicion of committing criminal activities, for a brief period to ascertain whether criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 26 (1968). The defendant maintains, as does the driver of the RV, that there were no traffic violations committed by the defendant, and therefore the officer did not have reasonable suspicion to stop and detain the RV. See generally Whren v. U.S., 517 U.S. 806, 811-13 (1996) (The court held that an automobile may be stopped "where the police have probable cause to believe a traffic violation has occurred").

Both defendants have stated, under oath, that there was no commission of a motor vehicle infraction. Furthermore, there is reason to believe, based upon the report of the arresting deputy,

-4-

attached hereto as Exhibit A, that the stop was pretextual and not based upon any observed motor vehicle violation.

After the deputy confirmed that the driver had a license, he proceeded to demand identification from the defendant, Sean Stark, the passenger in the RV. He then reports that he did "background checks" on *BOTH* men, not just the driver. Furthermore, before he ever writes a summons or anything else to do with the alleged lane violation, he requests to search the RV. When that permission is denied, rather than completing the summons process and requesting they wait for a canine unit to arrive, the officer detains the parties by bringing the driver of the RV back to the police car and questioning him. Even before this, he announced that he would be summoning a canine unit to the scene. There is no question that under these circumstances, the occupants of the RV were not free to leave the scene, and were detained for Fourth Amendment purposes. See generally Berkemer v. McCarty, 468 U.S. 420, 436 (1984).

As the sequence of events show in this case, the stop was an attempt to discover narcotics in the RV, not to enforce the traffic laws. The defendants maintain that there was no violation of the traffic laws that precipitated the stop, and therefore the entire stop was unconstitutional. See Whren v. United States, 517 U.S. 806 (1996). Where the entire stop was without any suspicion of criminal activity, the evidence seized as a result of that stop should be suppressed. See generally id.

3. There was no consent to search, and no probable cause to believe a crime was being committed.

Assuming, *arguendo*, that the Court finds probable cause to effect the traffic stop, the officer had no reasonable articulable suspicion that the defendant and/or the driver of the vehicle had

committed any other criminal actions. Neither person in the RV gave the officer consent to either search or to hold them there until a canine unit arrived. Absent consent, and without probable cause to delay the RV, the officer could detain the parties and the RV for a canine "sniff," and the subsequent canine sniff (along with the ensuing search and seizure) was in violation of the Fourth Amendment.

When an officer pulls over a vehicle on the highway, that person is not free to leave until the purpose of the traffic stop is accomplished. The officer has authority to make the traffic stop where he has probable cause to believe a traffic violation has occurred. Whren, 517 U.S. at 811. Once the vehicle is stopped, he generally has authority to order the parties out of the RV for his safety during the period of the stop. See Maryland v. Wilson, 519 U.S. 408, 414-415 (1997). The Supreme Court held in that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures. Pennsylvania v. Mimms, 434 U.S. 106, 111, n. 6, (1977).

However, once the purpose of the traffic stop is over, the persons should be free to go. Where they are not, the legitimate traffic stop becomes an unlawful detention. See e.g. United States v. Mendenhall, 446 U.S. 544, 554 (1980), ("a person has been 'seized' within the meaning of the Fourth Amendment . . . if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" ). In this case, after the purpose of the traffic stop should have been terminated, the driver was brought back to the officer's car. At that point, he clearly was not "free to leave," and therefore seized for purposes of the Fourth Amendment. See Berkemer v. McCarty, 468 U.S. 420, 436 (1984) ("Certainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so"). The

determination of whether a stop violates the Fourth Amendment is whether it is reasonable under all the circumstances. Id.

An investigative detention must be no longer than necessary to effect the purposes of the stop. Florida v. Royer, 460 U.S. 491, 500 (1983). The defendant acknowledges that a stop may end, and subsequently change from a "detention" to a "consensual conversation" without any notice by the officer to the driver. See Ohio v. Robinette, 519 U.S. 33, 50 (U.S., 1996) ("The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. . . .") (Ginsburg, J., concurring). However, unlike the driver in Robinette, the defendants in this case were never free to go. In Robinette, the officer had already handed the driver his Warning, and was having a conversation with him at the rear of the vehicle. Robinette, 519 U.S. at 36. In the defendant's case, the officer brought him back to the cruiser and kept him there, where he was not, nor could he have believed he was, "free to leave." See Berkemer v. McCarty, 468 U.S. at 436. Much like in Robinette, once the officer had either written Mr. Sugar a citation, arrested him, or given him a warning, the purpose of the traffic stop was concluded. Robinette, 519 U.S. at 36. "At no time prior to the search of respondent's vehicle did any articulable facts give rise to a reasonable suspicion of some separate illegal activity that would justify further detention." See United States v. Sharpe, 470 U.S. 675, 682 (1985); United States v. Brignoni-Ponce, 422 U.S. 873, 881-882 (1975); Terry v. Ohio, 392 U.S. 1, 21 (1968). As an objective matter, it inexorably follows that when the officer had completed his task of either arresting or reprimanding the driver of the speeding car, his continued detention of that person constituted an illegal seizure. Ohio v. Robinette, 519 U.S. 33, 50-51 (U.S., 1996) (Stevens, J., dissenting).

In this case, there are two things worth noting. Firstly, the officer did not take any action regarding the Motor Vehicle stop (such as issuing a warning or a summons, like was done in Robinette) while the passengers were being detained. See Exhibit A at 3-5. Secondly, the officer – by his own report – requested, and was denied, permission to search before he ever wrote the summons. He also stated that he would have a canine unit respond while he wrote the summons. Exhibit A, page 3. The officer then, again by his own report, brought the driver back to his vehicle to "run a record check," which would clearly indicate to the driver that he was not free to leave. See generally Berkemer v. McCarty, 468 U.S. at 436. Finally, the third to last sentence of the report indicates that the deputy issued a "lane violation" summons. Clearly, this process was extended for the purpose of keeping the defendants there until the canine unit responded. Under the totality of the circumstances in this case, it is clear that the passengers of the RV were not free to go. See generally Ohio v. Robinette, 519 U.S. at 39-40.[2]

There was no probable cause to believe there were drugs in the RV at the time the officer stopped it, nor was there any created by the actions of the passengers. Compare Wyo. v. Houghton, 526 U.S. 295, 298 (1999) (where the officer noticed a hypodermic syringe in Young's shirt pocket during a traffic stop, and the driver replied that he used it to take drugs). The officer mentions several things in the report, none of which (alone or in combination) would be sufficient to give him probable cause, including the nervousness of the parties and the presence of a CB radio. Compare U.S. v.

---

[2] The defendant concedes that a "canine sniff" is not generally considered a search under the Supreme Court's Fourth Amendment jurisprudence. However, the detention pending the arrival of a canine unit is not likewise exempt from Fourth Amendment principals. See generally United States v. Place, 462 U.S. 696 (1983).

-8-

Kimball, 25 F.3d 1, 15-16 (1st Cir. 1994) (where the officer found a car in school parking lot after midnight, a pattern of burglaries, and the police officer's knowledge of the defendant's history of burglaries prior to the stop).  The deputy sheriff cannot search any vehicle he pulls over for traffic violations without either probable cause or consent.  Knowles v. Iowa, 525 U.S. 113, 119 (U.S., 1998).

In this case, the officer clearly did not have any reasonable suspicion of further wrongdoing beyond the traffic violation.  "The court must consider the circumstances as a whole, and must balance the nature of the intrusion with the governmental interests that are served."  United States v. Hensley, 469 U.S. 221, 228 (1985).  While the governmental interest in intercepting drug trafficking is high, the nature of the intrusion in this case is higher.  The parties, apparently because of their denial of consent to search, were held at the side of the road for more than 15 minutes while the deputy called in a canine unit to search.  This practice clearly abrogates the defendant's right to say no to a search, where the officer takes actions clearly based upon the defendant's denial of permission to search.  If the officer had intended to order a canine search, he could have requested the unit to respond before the traffic stop, or even before he approached the vehicle.  Instead, the canine unit was only called after the parties asserted their right not to be searched.  The deputy instead effected a seizure of the parties and the RV by keeping them at the side of the road, waiting for the canine unit to respond.

While there may be combinations of circumstances which justify detaining parties until a canine unit can be summoned to the scene, this was not one.  Compare. e.g., United States v. Withers, 972 F.2d 837, 843 (7th Cir. 1992) (defendant's nervousness, authorization to search purse but not garment bag, and prior arrest for trafficking narcotics); U.S. v. Levescue, 1995 U.S. Dist. LEXIS 10349, 12

(D.N.H. 1995) (where the defendant rented the van with cash, was carrying a pager, was travelling alone in another party's U-haul, had a prior narcotics conviction, lied about that prior conviction, was traveling with another vehicle and explained it as "coincidence," and was sweating and nervous after his seizure). This case is a straightforward vehicle stop, without any conditions leading the reasonable officer to suspect anything other than long distance travel, and therefore the seizure is unreasonable. Where the seizure is unreasonable, all evidence seized as a result of it must be suppressed.

4.   There was no probable cause or reasonable suspicion to believe a crime was being committed, and therefore the deputy's actions in detaining the defendant(s) at the side of the road waiting for a canine unit were a seizure in violation of the defendant's Fourth Amendment rights.

In this case, the timing of the Deputy's actions is the key to understanding the illegal seizure. While the overall delay was not as long as in other cases where seizures have been ruled reasonable, there is no doubt that in this case the seizure was overly long. See United States v. Quinn, 815 F.2d 153, 157 (1st Cir. 1987) (remarking that "there is no talismanic time beyond which any stop initially justified on the basis of Terry becomes an unreasonable seizure under the fourth amendment") (quoting United States v. Davies, 768 F.2d 893, 901 (7th Cir. 1985)); United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998). The problem in the instant case is not the delay alone, but the purposes for the delay.

If this delay were only for the writing of the summons, it would no doubt be reasonable. However, the officer made it clear they were being held until the canine unit arrived at the scene. See Exhibit A at 3. This time was far more than necessary for writing a summons. This delay was also a direct result of the defendant's assertion of his right not to be searched. Id. Moreover, the seizure was

not based upon reasonable suspicion of criminal wrongdoing that could be based upon articulable facts, but was based rather on either the Deputy's hunch, job requirements, or the assertion of the right not to be searched.

Wherefore, the defendant moves to Suppress the evidence, including the drugs and the firearm, seized as a result of the unlawful and warrantless search.

Respectfully Submitted,
Sean D. Stark, by his attorney,

Date:   March 31, 2004

Melvin Norris
260 Boston Post Road, Suite 9
Wayland, MA 01778
(508) 358-3305
BBO# 373900

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Assistant United States Attorney Cynthia W. Lie, Federal Courthouse, Boston, Massachusetts on this date by first class mail, postage prepaid.

Date:   March 31, 2004

UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                              CR# 03-10362 PBS

SEAN D. STARK

### AFFIDAVIT OF SEAN D. STARK

Now comes the above named Sean D. Stark, and states the following under oath:

1. I am the defendant in the above matter.

2. I was riding in a Motor home on October 22, 2003, eastbound on Interstate 44 in Missouri, at approximately 2:45 p.m. NOON.

3. The motor home I was riding in was driven by Christopher Sugar.

4. The vehicle I was riding in was stopped by a marked police car, and the officer approached the motor home.

5. The officer asked for the driver's license of Mr. Sugar, and returned to his vehicle to "run the license." The officer remained in his car for more than a minute.

6. The officer returned to the motor home, and told us that he stopped us because he thought the driver had been drinking, but did not field sobriety tests.

7. When he returned, he stated that "what I'm looking for is narcotics," and asked if he could search the motor home.

8. I responded no, since he stated that they were pulled over for suspicion of drinking. I had authorization to borrow the motor home as shown by the note I handed to the officer.

9. The officer then took the driver, Mr. Sugar, back to his patrol car for more than 5 minutes, I believe to question him.

10. After five minutes or so had passed, I walked back to the patrol car to ask how much longer we would be held there. The officer informed me we would be held there until a canine unit arrived.

11. Another five minutes passed, and the officer told me that if we had "personal use" marijuana in

the vehicle, he would allow us to dump it in the median and leave.

12. Several minutes after that, the canine unit arrived, and was accompanied by several plainclothes officers. The "trainer" walked the dog around the vehicle more than four times. The dog repeatedly pulled the trainer down the hill, and was not focusing on the motor home. At one point during the walking around, the dog became aroused.

13. At no point during this encounter did officers get a warrant to search, to the best of my knowledge.

14. On approximately the fourth trip around the motor home, the dog barked at the front door to the motor home. The dog had been wandering around near the motor home for about 2 minutes.

15. After the dog barked at the door, the officers entered the vehicle without asking either myself or Mr. Sugar for permission to enter the vehicle.

16. After they had been in the vehicle a short time, they came out to ask me to unlock a closet. I informed them I did not have the key to the closet, and that it was closed since we left Arizona.

17. I could not open the closet, so the officers forced the closet door open.

18. The dog never went into the motor home.

19. After my arrest, one of the officers who was with the canine unit told me that the officer who pulled me over was paid to pull over vehicles searching for narcotics.

Signed under the pains and penalties of perjury this 27 day of March, 2004.

_____
Sean D. Stark