UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
UNITED STATES OF AMERICA       )
                               )
              v.               )  CRIMINAL NO. 03-10362-PBS
                               )
CHRISTOPHER SUGAR and          )
 SEAN D. STARK,                )
              Defendants.      )
_____)
```

**MEMORANDUM AND ORDER RE:**
**DEFENDANTS' MOTION TO SUPPRESS**

June 24, 2004

Saris, U.S.D.J.

## INTRODUCTION

Defendants, charged with trafficking in marijuana, move to suppress marijuana discovered in the closet of a recreational vehicle in Missouri. At the evidentiary hearing on May 18 and 19, 2004, Carmelo Crivello of the Phelps County Sheriff's Department, and Defendants Sean Stark and Christopher Sugar testified. After hearing, the motion to suppress is **ALLOWED**.

## FINDINGS OF FACT

On October 22, 2003, Carmelo Crivello of the Phelps County Sheriff's Department in St. Louis County, Missouri, was on the day shift patrolling I-Rte. 44. Because I-44 is a drug pipeline route, in the Sheriff Department's view, it has an aggressive drug interdiction practice there.[1]

_____

[1] Nearby, on Route 44, the Sheriff's office instituted a ruse called the Sugar Tree stop. A sign states that there is a

At about 12:30 p.m., Crivello saw a large recreational vehicle (RV) with Vermont plates traveling in the right lane of a highway divided by a grass median.  On Crivello's side, there were two lanes and a shoulder.  Intentionally trailing the RV in the passing lane for a half mile, Crivello hoped to discern a traffic violation.  Crivello wanted to find grounds to stop the RV to search for drugs because it had out-of-state plates and was on a pipeline route.  Crivello finally saw the right rear tire go completely over the "fog line," the white traffic line demarcating the shoulder, once.  Crivello activated his blue lights and pulled over the RV.

The RV was 40 feet long and 13 feet tall.  The driver, Christopher Sugar, and passenger, Sean D. Stark, are 30-something males.  The driver, Christopher Sugar, had seen the marked cruiser in the passing lane and was making a deliberate effort to comply with traffic laws.  The RV had been following a tractor-trailer, and Sugar believed that the wind turbulence from the

---

drug stop ahead with drug-sniffing canines.  When cars take the "Sugar Tree" exit, cruisers follow them in order to detect a motor vehicle violation.  Once a car is stopped, if the inhabitants don't consent to a search, the car is held until a canine arrives.  This practice has been heavily litigated.  See United States v. Yousif, 308 F.3d 820, 827-28 (8th Cir. 2002) (holding that the Sugar Tree checkpoint program violated the Fourth Amendment when officers operating the checkpoint were instructed to stop *every* vehicle that took the exit, regardless of whether a traffic violation had occurred); United States v. Martinez, 358 F.3d 1005, 1008-09 (8th Cir. 2004) (holding that the Sugar Tree ruse did not violate the Fourth Amendment when officers only stopped vehicles for minor traffic violations); United States v. Williams, 359 F.3d 1019 (8th Cir. 2004) (same).

trailer, or wind gusts, might have caused the RV to sway over the line.  While he does not remember any swaying, he concedes it was possible.  I find that the right rear double tires went over the fog line on the shoulder once.

Crivello approached the driver who was opening the driver side window.  As there was no door on the driver side, he then went to the passenger side.  When the door opened, steps automatically dropped down and Crivello ascended.  When Crivello told the driver of the traffic violation –- failure to maintain a single lane –- Sugar attributed any problem to the tractor-trailer.  Crivello did not believe him because he did not see any tractor-trailer pass the RV.  The men explained that they were going biking in Vermont but again Crivello was skeptical.  (The RV contained mountain bikes and camping gear).  Crivello requested both licenses.  Stark, the passenger, moved the CB radio away from the console to retrieve the licenses.  Stark showed Crivello a note providing permission from the owner to use the vehicle.

Commenting that lots of narcotics were transported on the road, Crivello asked both men if they were transporting anything illegal and both stated no.  Crivello then asked them to consent to a search of the RV and said that if they declined, he would call a canine unit.  When they both refused his request for a search, Crivello next informed them that he was going to have the canine come to respond to the scene while he wrote up a summons

for the traffic violation.  Crivello told Sugar to return to
Crivello's police car and left Stark at the RV.  Complying, Sugar
did not appear nervous.  Crivello then contacted Sheriff
Blankenship and requested that he respond with his canine.  Stark
came to the cruiser to make small talk.  To Crivello, Stark
seemed nervous because his hands were trembling and he seemed
talkative.  Stark asked if Crivello stopped them because they
were two kids driving a motor home.  No field sobriety test was
done.

In the intervening time the record checks came back clean.
The licenses were valid, and there was no criminal history.
However, the licenses showed that both men were from Arizona,
which Crivello believed was a source state for drugs.  Crivello
told the men they were "free" to go to a nearby restaurant or
hotel to wait for the canine, but that they could not take the
RV.  The men declined and waited by the RV.  After receiving the
clean record check, it took about 10 to 15 minutes more for the
dog Nitro to appear.  Altogether, the canine unit arrived about
20 minutes after Crivello initially stopped the RV for the
traffic violation.

Once the canine unit arrived, the dog peed and then alerted
to the right rear of the RV.  The assembled law enforcement
officers then entered the RV where they eventually found 376.9
pounds of marijuana in a locked closet.  Stark and Sugar told the
police that they did not have the key to this closet and that the

closet had been locked from the time they left Arizona.
Admitting during his testimony he lied to the police (and that he
knew about the marijuana), Stark testified he had a key to the
closet, which had been hidden.  Sugar testified he did not know
where the key was (and did not know the closet contained
marijuana).

Crivello gave the following reasons for the <u>Terry</u> stop: (1)
the RV had out-of-state plates; (2) the drivers were from
Arizona, a "source" state on a known drug trafficking corridor;
(3) Stark tried to kick the CB radio under the seat; (4) Crivello
thought it was suspicious that the two men were going all the way
across country just to mountain-bike in Vermont; and (5) Stark,
the passenger, appeared nervous and talkative.

Crivello wrote up a traffic violation the next day but did
not file it in court until told to do so by the U.S. Attorney.

Both defendants testified at the hearing.  I found Sugar
credible.  He is employed, college-educated, and was honorably
discharged from the Army.  Although he shares these
characteristics, Stark is less credible because he lied to the
police and made a misleading statement in his affidavit.  Stark
has "trembling limb syndrome" for which he takes medication.


**DISCUSSION**

**A. The Fourth Amendment Applied to Traffic Stops**

The Fourth Amendment guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend IV. "As interpreted, the [A]mendment's prohibition against unreasonable searches and seizures extends only to protect those places and interests in which the accused can be characterized as having a legitimate expectation of privacy." United States v. Cruz Jimenez, 894 F.2d 1, 5 (1st Cir. 1990) (citing Rakas v. Illinois, 439 U.S. 128, 140-50 (1978)). "Demonstration of such an expectation is a threshold standing requirement, and analysis cannot proceed further without its establishment." Id.

"A traffic stop, by definition, embodies a detention of the vehicle and its occupants." United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001). "It therefore constitutes a seizure within the purview of the Fourth Amendment." Id. (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)); see also Whren v. United States, 517 U.S. 806, 809-10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision."). "This means, of course, that the stop must be supported by a reasonable and articulable suspicion of criminal activity, see Berkemer v. McCarty, 468 U.S. 420, 439 (1984), and that the detention must be reasonable under the circumstances, Whren v. United States, 517 U.S. 806, 809-10 (1996)." Chhien, 266 F.3d at

5-6. A reasonable, articulable suspicion is "more than a naked hunch," but less than "either probable cause or evidence of a direct connection linking the suspect to the suspected crime." Id. at 6.

"In determining whether, in the absence of probable cause, an investigatory seizure and search violates the Fourth Amendment, [the First Circuit] use[s] the two-prong test set forth in Terry v. Ohio." United States v. Nee, 261 F.3d 79, 83 (1st Cir. 2001). "First, we ask whether the officers' actions were justified at their inception, and second, whether their actions were reasonably related in scope to the circumstances which justified the officers' initial interference." Id. A court must be flexible in this analysis because, "while an officer's actions must bear some relation to the purpose of the original stop, he may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention." Chhien, 266 F.3d at 6.

Moreover, "there is no talismanic time beyond which any stop initially justified on the basis of Terry becomes an unreasonable seizure under the [F]ourth [A]mendment." United States v. McCarthy, 77 F.3d 522, 530 (1st Cir. 1996) (citations omitted). Therefore, "[t]he reasonableness inquiry is almost always fact specific." United States v. Owens, 167 F.3d 739, 748 (1st Cir. 1999). "[A]n inquiring court must balance 'the nature and quality of the intrusion on personal security against the

7

importance of the governmental interests alleged to justify the intrusion.'"  Chhien, 266 F.3d at 6 (quoting United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998)).

"The Supreme Court has directed courts making this inquiry to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  Owens, 167 F.3d at 749 (citing United States v. Sharpe, 470 U.S. 675, 686 (1985)).  Moreover, "[d]eference is due to the experienced perceptions of the officers, but not blind deference; these perceptions must be reasonable under an objective standard."  United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000) (citing Ornelas v. United States, 517 U.S. 690, 699-700 (1996)).

## B.  The Initial Stop

Sugar and Stark challenge Crivello's initial stop of the RV based on Crivello's claim that the right rear double wheels of the RV crossed over into the right shoulder three times. Crivello asserts that he had probable cause to stop the RV for a violation of Mo. Rev. Stat. § 304.015.5.  The text of that statute reads, in relevant part, "[w]henever any roadway has been divided into three or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane"  (emphasis added).

While I find that Crivello is credible that the right rear tires went completely over the "fog line" on the shoulder once, this movement does not constitute a violation of Missouri law. While the parties did not raise this issue, the section of Route 44 on which the incident occurred was a two-lane highway, which would appear to fall outside the scope of the statute.

Furthermore, the phrase "as nearly as practicable" indicates that the statute was not intended to comprehend minor swerving. See United States v. Freeman, 209 F.3d 464, 466 (6th Cir. 2000) ("[w]e cannot . . . agree that one isolated incident of a large motor home partially weaving into the emergency lane for a few feet and an instant in time constitutes a failure to keep the vehicle within a single lane 'as nearly as practicable'") (citing United States v. Gregory, 79 F.3d 973, 978 (10th Cir. 1996) (holding that a U-haul truck's similar one time entry into the emergency lane failed to constitute a violation of a statute nearly identical to the statute at issue)).

Because I find Sugar credible when he says he saw the marked cruiser and was attempting to comply with traffic laws, I find it highly unlikely that the rear wheels went substantially onto the shoulder three times in half a mile. While Sugar did not deny the possibility that a rear tire went over the line because it was a large van, he did not notice a problem. Regardless, such one-time movement was not a violation of the Missouri statute. Accordingly, the initial stop was not reasonable or justified by

probable cause under Missouri law.

Because "the stop of the car is held unlawful, the drugs should be suppressed as the fruit of the poisonous tree." United States v. Rowell, 2004 WL 555261 at *6 (D. Mass. March 18, 2004); see also Wong Sun v. United States, 371 U.S. 471, 487-88 (1963) (holding that evidence that would not have been obtained but for an unlawful search must be excluded as "fruit of the poisonous tree").

**C.    The Continued Seizure**

Even if the initial stop were justified, defendants argue that Crivello did not have a reasonable suspicion to detain Sugar and Stark beyond what was strictly necessary to effectuate the traffic stop.  Once Crivello checked Sugar's license, examined the note authorizing Stark to use the RV and the registration, he had all the information he needed to issue the citation for the traffic violation.  Rather than allowing Sugar and Stark to continue on their way, however, he held them there until a canine unit arrived.  The question is whether this 10 to 15 minute-long seizure was justified by reasonable suspicion.

First, in his initial encounter with defendants, Crivello said he would hold the vehicle until the canine came if defendants refused to consent to a search.  But an assertion of one's constitutional rights should not be the basis for an otherwise unjustified detention.  See Florida v. Bostick, 501

U.S. 429, 437 (1991) ("We have consistently held that a refusal
to cooperate, without more, does not furnish the minimal level of
objective justification needed for a detention or seizure.")
(citations omitted).  In fact, their refusal to consent to the
search distinguishes this case from those in which the
defendant's own consent prolonged a traffic stop.  See Williams,
359 F.3d at 1020 (after a valid traffic stop at the Sugar Tree
exit, defendant "consented to a search of his vehicle . . .
[which] revealed 593 pounds of marijuana"); Martinez, 358 F.3d at
1007 ("[d]efendant voluntarily consented to search of his motor
vehicle after valid Sugar Tree traffic stop which revealed 17
kilograms of cocaine); United States v. Hornbecker, 316 F.3d 40,
45 (1st Cir. 2003) (after initial traffic stop, defendant "was
twice told that he was free to go but consented to stay and
comply with the troopers' various requests," including a search
of his vehicle which revealed 400 pounds of marijuana); Chhien,
266 F.3d at 8 (a "consensual pat-down search" revealed $2,000 in
cash which in turn "justified a brief period of additional
questioning").

Second, Crivello reports that Stark's hands and voice were
trembling.  While Stark's apparent nervousness and loquaciousness
are factors which Crivello, a trained officer, properly
considered, without more, they cannot justify Crivello's decision
to detain the defendants.  Conceding that many people get nervous
when stopped by the police, Crivello emphasized that it was

unusual for a passenger to be nervous.  Here, however, Crivello
was standing next to the passenger (not the driver) and requested
both licenses.  Also, the weight to be given to this factor is
diminished by the fact that the driver was not nervous.

Next, Crivello claimed that Stark tried to hide the CB
antenna under the seat with his foot.  Both defendants denied
this.  This testimony is not credible because a CB is not
illegal, and there would have been no motivation to hide it under
a seat.  Instead, it was in front of the console on the floor
where the documents were kept.  Stark moved the CB when he went
into the console to retrieve the papers.

Finally, defendants gave a consistent story that they were
traveling to Vermont to go mountain-biking and offered proof,
including the mountain bikes.  The government argues that the
defendants' story was not credible: Why go biking in Vermont when
you can bike in Arizona?  However, October is prime foliage
season in Vermont, and a plan to bike there hardly seems
suspicious at that time of year.  Contrast Chhien, 266 F.3d at 4-
7 (conflicting stories were given to police questions by
passenger and driver, a consensual frisk revealed $2,000 cash, a
five-minute delay caused a passenger "to squirm in her seat" and
"this fidgeting ultimately led the troopers to the contraband");
United States v. Maldonado, 356 F.3d 130, 132-33 (1st Cir. 2004)
(police noted that the defendant was speeding, driving without
the corrective eyewear his license said he needed, his license

had been suspended, he had not maintained the required logbook for long distance trucking, and his story was inconsistent, all before calling for a canine unit); Owens, 167 F.3d at 747 (police noted that the driver was speeding and had no license, the driver and passengers gave "conflicting responses" to police, including false names, and a check revealed that defendants had multiple prior convictions, all before calling for a canine unit); Sowers, 136 F.3d at 27-28 (holding that post-stop behavior such as the inability to confirm identity, excessive nervousness and conflicting stories provided adequate justification to prolong stop).

Thus, even if the initial stop were lawful under Missouri traffic law, I conclude that Officer Crivello did not have reasonable suspicion for holding the defendants until the canine arrived. While Officer Crivello's hunch turned out to be true, the fact that the defendants were from a source state heading across the country for a bike trip on a known drug pipeline do not give rise to reasonable suspicion because too many people fit this description. See Yousif, 308 F.3d at 828 (holding that the facts that defendant had out-of-state license plates and was traveling on a highway that was a known drug trafficking corridor alone cannot justify the stop); see generally Reid v. Georgia, 448 U.S. 438, 441 (1980) (expressing concern in the airport search context about a drug courier profile that would "describe a very large category of presumably innocent travelers who would

be subject to virtually random seizures"). Even with the addition of the passenger's nervousness to the calculus, the government has not surmounted the reasonable suspicion hurdle.

Because the detention was unreasonable under the Fourth Amendment, anything resulting from it is excludable as fruit of the poisonous tree. See Wong Sun, 371 U.S. at 488.

### E. Sugar's Standing

The government concedes Stark's standing because he knew where the key to the closet was, but argues that Sugar has no standing to contest the seizure because he had no legitimate expectation of privacy in the locked closet in which the drugs were found. See United States v. Soule, 908 F.2d 1032, 1034 (1st Cir. 1990). The "person who claims [Fourth Amendment] protection" must have a "legitimate expectation of privacy in the invaded place." Rakas, 439 U.S. at 130, 143 (holding that defendants had no standing where they "conceded that they did not own the automobile [searched] and were simply passengers; the owner of the car had been the driver of the vehicle at the time of the search").

While defendants acknowledge that they did not own the RV, "property rights are neither the beginning nor the end of [the relevant] inquiry." United States v. Salvucci, 448 U.S. 83, 91 (1980). The court must inquire "not merely whether the defendant had a possessory interest in the items seized, but whether he had

14

an expectation of privacy in the area searched." Id. at 92; see also Minnesota v. Olson, 495 U.S. 91, 96-97 (1990) (finding that an overnight guest has a protected expectation of privacy in the home in which he stays).

Generally speaking, persons who borrow cars have standing to challenge searches of the borrowed vehicles. Compare United States v. Baker, 221 F.3d 438, 442-43 (3d Cir. 2000) (holding that the driver of a borrowed car "had the requisite legitimate expectation of privacy to support standing for Fourth Amendment purposes") (citing multiple cases from other circuits); United States v. Garcia, 897 F.2d 1413, 1418-19 (7th Cir. 1990) (holding that because the government was unable to prove that a truck in which illegal drugs were discovered was stolen, the driver and passenger had standing to challenge the search); United States v. Miller, 821 F.2d 546, 549 (11th Cir. 1987) (holding that the driver of a car who had permission to use the car had standing to challenge its search); United States v. Posey, 663 F.2d 37, 40-41 (7th Cir. 1981) (holding that the driver of a car owned by his wife, who had given him permission to use it, had a legitimate expectation of privacy under the Fourth Amendment) with United States v. Bouffard, 917 F.2d 673, 676 (1st Cir. 1990) (holding that a defendant who had borrowed a car for a limited period of time had no legitimate expectation of privacy in the car's locked trunk where it was the very person from whom he had borrowed the car who first called the police, after he failed to return the

15

car); <u>Soule</u>, 908 F.2d at 1036 (holding that where the defendant "was nowhere near the pick-up truck at the time it was stopped, detained and searched, and there is no evidence that [he] had any proprietary or possessory interest either in the vehicle, or its contents, or any right to exclude others from the vehicle, it would be difficult to posit a clearer failure to demonstrate any legitimate expectation of privacy on the part of the defendant") (internal citations omitted); <u>United States v. Sanchez</u>, 943 F.2d 110, 113-14 (1st Cir. 1991) (holding that the defendant failed to demonstrate legitimate expectation of privacy where he could not show that he had the owner's permission to use the car or demonstrate prior use or control of the car).

The government does not dispute that Sugar, an authorized borrower of the car, had a reasonable expectation of privacy in the RV itself, but only that he lacked such an expectation in the closet.  I disagree because he was the driver of the car at the time of the stop, had possession of the keys to the car, had been living in the RV for the two days prior to the search, and planned to use the RV as a home for the duration of the cross-country trip.

Courts have recognized standing by homeowners to challenge searches of containers found on their premises but owned by third parties.  <u>See</u> <u>United States v. Garcia-Rosa</u>, 876 F.2d 209, 218 (1st Cir. 1989) (holding that defendant had standing to challenge the seizure of a box regardless of who owned it because it was in

16

a house owned and possessed by defendant); <u>United States v. Isaacs</u>, 708 F.2d 1365, 1367-69 (9th Cir. 1983) (holding that defendant had legitimate expectation of privacy in contents of locked safe stored in his apartment but owned by third party); <u>United States v. Perez</u>, 700 F.2d 1232, 1236 (8th Cir. 1983) (holding that defendant could challenge search of luggage belonging to overnight guests staying in his house); <u>United States v. Gomez</u>, 276 F.3d 694, 697 (5th Cir. 1998) (holding that defendant had a "reasonable expectation of privacy in a locked vehicle owned and operated by a third party but parked on [defendant] homeowner's driveway" where the evidence seized was the subject of the unlawful enterprise in which defendant participated).

In these circumstances, the fact that Sugar did not have a key to the closet does not defeat standing because he had a legitimate expectation of privacy in the room containing the closet.

### ORDER

The motion to suppress is **ALLOWED**.


                              **S/PATTI B. SARIS**
                              United States District Judge